Milligan, J.,
delivered the opinion of the court:
This is an ordinary application under the Act March 12,1863, to reclaim the proceeds of twenty-three bales of cotton, captured by the United States military, on the claimant’s plantation, near Courtland, in Alabama, in January, 1865.
There is no contest as to the title, seizure, shipment, sale, and payment of the proceeds into the Treasury. These several points, which are essential to the claimant’s right of recovery, are fully proven in the record.
The only question at issue is the amount for which the judgment should be rendered.
The cotton, after seizure, appears to have been consigned and shipped to General Donaldson, at Nashville, Tenn., where it was received by S. P. Brown, acting quartermaster, and transferred by him to Charles A. Fuller, assistant special agent of the Treasury Department at that place.
Soon after the cotton came into Fuller’s hands, he sent it forward to W. P. Mellen, supervising agent, Treasury Department, at Cincinnati, where it was sold, together with two other bales, for the gross sum of $5,136.79.
The charges on this lot of twenty-five bales of cotton, at Nashville, amount to $245.50, and at Cincinnati to $938.63, making the aggregate sum of $1,184.13, which, when deducted from the gross sales, leaves $3,952.66, net proceeds.
Among the items charged at Cincinnati to which the claimant excepts, are the following:
“Custom house fees on 12,781 pounds, at 4cents. -.. $511 24
Internal-revenue tax, at 2 cents... 255 62”
The item of expense first mentioned above, it is believed has never been authoritatively decided by this court. It is now pre-. sented in such a form as to require decision. The question is not without importance both to the claimant and to the defendants, nor is it free from difficulty.
The third section of the Act March 12th, 1863, declares the owner entitled to the “residue” of the proceeds, “after the deduction of any purchase-money which may have been paid, together with the expenses of transportation and sale of said property, and any other lawful expenses attending the disposition thereof.”
If the construction of this part of the statute was presented *442 as an original question, standing alone on the Act. March 12th, 1863, we would have little hesitation in holding that it was the intention of Congress to direct that the proceeds of the sales of abandoned and captured property be first paid into the Treasury, accompanied by a bill of charges, which could be there audited, and the lawful expenses deducted therefrom.
This view of the original act seems not only in harmony with the intention of the legislature, but in strict accord with a just and economical administration of a trust-fund placed by law in the hands of the Government itself; and, we doubt not, it would have been carried out by the Secretary of the Treasury, had he been able to command the funds necessary to execute the law. But the war was pending, and the Treasury daily suU jected to heavy and exhaustive drafts. The money necessary to be employed for this purpose was not in the Treasury, and therefore the Secretary doubtless resolved, by a stretch of his authority under the act, to make each lot or parcel of property sold by the agents bear its own expenses. The result was the Treasury regulations of the 11th of September, 1863, in which it is provided:
“ Supervising special agents will pay or cause to be paid, out of the general fund arising from the sale of all property collected and received in their respective agencies, all expenses necessarily incurred in collecting, receiving, securing, and disposing of the same, including fees, taxes, freights, storages, charges, labor, and other necessary expenses, being careful to avoid all useless or indiscreet expenditures; and will charge each particular lot or parcel with the specific or proportionate amount of all such expenses as can be made specific or proportionate charges to each lot or parcel; and will also charge and ■ retain out of the proceeds of each lot or parcel one and one-half per centum thereof for the payment of such expenses connected with the collection, transportation, and sale, or other disposition thereof, as cannot be made specific or proportionate charges against each lot or parcel, or are not otherwise provided for, such as rents, compensation to clerks or other employés, auctioneers, printing and advertising, a carefully stated account of which will be kept by such agents, showing in detail all expenses paid out of this fund arising from such charge; and unless unavoidably prevented, they will- take vouchers for all expenditures made under this regulation, and transmit the same *443 with their accounts. Of the balance, if any, of said one and one-half per cent, remaining after defraying said expenses, the several supervising Special agents may retain, as compensation for extra care and responsibility, a sum not exceeding one-half of one per cent., and with the remainder, if any, may reward extra services in collection and care of property rendered by agents and others.” (See Treasury Rules and Regulations, reprint, Rule XIV, p. 87.)
Granting much to the necessity that surrounded the Secretary, it will scarcely be contended that this regulation is, in all respects, sustained by the Act March 12th, 1863. Congress saw the difficulty, and by the “Act in addition to the several acts concerning commercial intercourse, and to provide for the collection of captured and abandoned property,” approved July 2d, 1864, recognized the authority of the Treasury Begulatious of the 11th of September, 1863 ; but was careful to provide in the third section that all moneys arising from the sale of captured and abandoned property “shall, after satisfying therefrom all proper and necessary expenses, to be approved by the Secretary of the Treasury, be paid into the Treasury of the United States; and all accounts of moneys received or expended in connection therewith shall be audited by the proper accounting officers of the Treasury;” thus, in some degree, conforming the practice of the Treasury Department to the original intention of Congress, as indicated in the Act March 12th, 1863, and securing to the owners of the fund, in a limited sense, the means of protecting it against fraud and injustice.
But this practice of the Treasury Department does not always do exact justice to claimants. Unlawful charges may be made and admitted at the Treasury, which, in a proper case, a court of justice would be bound to correct. But how, in a proceeding like the one now before ns, can this be done? The claimant’s suit is under the captured and abandoned property act, and his right of recovery is limited to the “residue” of the proceeds of his property in the Treasury. If unlawful charges have been made against the proceeds and such charges were paid to third persons before the “residue” of the fund reached the Treasury, how can we now hold the Government responsible therefor? There is nothing in the Treasury, in such a case, to respond to a judgment rendered on such a hypothesis, and no power in this or any other court to hold the United *444 States responsible for mistakes, unlawful acts, or misfeasances of its own officers or agents.
But, as already indicated, we are bound to take cognizance, in a proper case, of the expenses charged against the claimant’s property; and when it is made clearly to appear that any item of such charges is unlawful, and the amount thereof has been retained by the Government, or otherwise fairly traced into the Treasury, we will give judgment therefor as part of the net proceeds of the claimant’s property. Less than this, in our opinion, does not fulfill the demands of the statute, and more, in proceedings of this character, cannot be granted for want of jurisdiction. The Government at all times, in a different proceeding, has authority to hold its officers and agents to a strict account for the manner in which they have discharged the duties imposed upon them; and whether it is not the duty of the Government, standing, as it does, in the relation of a trustee to this fund, to see that it has been faithfully collected, is a matter that must rest in its own sound discretion.
Applying the rule above indicated to the first item of the charges to which exception has been taken, it seems clear “custom-house fees” are neither within the statute nor the regulations of the Treasury made pursuant thereto. By the terms of the statute, the “purchase-money,” if any, must first be deducted; next, the “expenses of transportation and sale;” and, in the third and last place, “any other lawful expenses attending the disposition thereof.”
The ground of charges in the statute looks alone to lawful expenditures and the re-imbursement thereof; nothing else is contemplated, and there can be no just charge against this fund unless it rests on that basis. “Custom-house fees,” as they appear in this record, are at most mere charges without disbursements, and therefore not within the statute.
The regulations of the Treasury Department, proceeding on the theory of the statute, with reference to which they must always be construed, direct supervising special agents to pay “all expenses necessarily incurred in collecting, receiving, securing, and disposing of the same.” No other charges than expenses are authorized by the regulations to be paid, although they may include “fees;” but such fees must not only be lawful, but necessary to a just disposition of the property, and be *445 paid out before they can become a just charge against the fund.
Having determined that this charge is not within either the statute or the regulations of the Treasury, the nest inquiry is to determine whether the money is in the Treasury to respond to any judgment we may render for it.
The regulations of the Treasury hereinbefore referred to require the agents to send up “carefully stated accounts,” * * “ showing in detail all expenses paid out of this fund arising from charges, and, unless unavoidably prevented, they will take vouchers for all expenditures made under this regulation, and transmit the same with their accounts.”
Doubtlessly if the item of charge under consideration constituted an actual expenditure, there are an account and voucher for it iu the Treasury, but none have been brought before us, and we are authorized to presume none can be produced.
Besides, if such account and voucher were furnished, we cannot doubt that they would show the “ custom-house fees” were retained by the Government, and that they are still in the Treasury, and subject to the rights of the claimant.
As to the second item of expense charged against the fund, to which exception is made, we need only say that it is a charge for “internal-revenue tax,” which this court has uniformly refused to allow, and which the Treasury Department has repeatedly recognized by paying judgments rendered therefor.
It follows, therefore, that the claimant is entitled to recover his just proportion of the $511.24 custom-house fees, and $255.62 internal-revenue tax, charged against twenty-five bales of cotton. His share of this lot of cotton being twenty-three bales, we find his proportion of the illegal charges above mentioned to be as follows:
Custom-house fees on 11,968 pounds, at 4 cents per pound.. $478 72
Internal-revenue tax, at 2 cents per pound.. 239 36
718 08
This sum, ($.718.08,) when added to the Treasury returns of the net proceeds of twenty-three bales, which we find to be $3,687.79, makes the sum of $4,405.87, for which judgment will be entered and certified.